AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the

Central District of California

| LODGED | |
| --- | --- |
| CLERK, U.S. DISTRICT COURT | |
| 9/25/2023 | |
| CENTRAL DISTRICT OF CALIFORNIA | |
| BY: _____ CD _____ DEPUTY | |

**FILED**
CLERK, U.S. DISTRICT COURT

**9/25/2023**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ ts _____ DEPUTY

United States of America

v.

RAFEAL YANNI,
aka "Rapheal Joseph Yanni," "Raphael Joseph Yanni," "Rafael Yanni,"

Defendant

Case No.  5:23-mj-00459-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of September 17, 2023, in the county of Riverside in the Central District of California, the defendant violated:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 922(g)(1) | Felon in Possession of Ammunition |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Jarrett Keegan*
_____
*Complainant's signature*

Jarrett Keegan, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  September 25, 2023
_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Stephanie Christensen, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA:  Kelsey A. Stimson (213-894-8230)

## AFFIDAVIT

I, Jarrett Keegan, being duly sworn, declare and state as follows:

### I.  PURPOSES OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint against and arrest warrant for RAFAEL YANNI, aka "RAPHAEL YANNI," aka "RAFAEL YANNI," ("YANNI") for a violation of 18 U.S.C. § 922(g)(1) (Felon in Possession of Ammunition) on September 17, 2023.

2.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, my review of official reports, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested arrest warrant, and it does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### II. BACKGROUND OF AFFIANT

3.   I am a Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") in San Bernardino, California.  I joined ATF in July 2014.  Before becoming an ATF SA, I was a Federal Air Marshal with the Federal Air Marshal Service for seven years. During my career in federal law enforcement, I have received extensive training regarding federal criminal law.  My education

includes a Bachelor's Degree in Aerospace Studies from Embry
Riddle Aeronautical University and a Master's Degree in Security
Management from American Military University.

4.    As an SA, I have completed training at the ATF
National Academy and the Federal Law Enforcement Training Center
related to federal firearms and narcotics laws and
regulations.  I regularly refer to these laws and regulations
during the course of my duties and have written and participated
in the execution of numerous search and arrest warrants for
violations of these statutes.  During my career in the field, I
have participated in the investigation, surveillance, and arrest
of numerous prohibited persons in possession of firearms, as
well as firearms and narcotics traffickers, and persons engaged
in crimes of violence such as robbery, carjacking, attempted
murder, and murder.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

8.    On September 17, 2023, YANNI brandished a gun and then
shot two victims outside of a restaurant in San Bernardino,
California.  Surveillance video from inside the bar captured
YANNI brandishing a pistol before exiting to the parking lot.
Surveillance video from outside the bar captured YANNI in a
physical altercation with one of the victims.  The video
displayed YANNI pointing a pistol at the victim who appeared to
be fending off a second adult male, later determined to be
YANNI's associate.  YANNI then fired three rounds at short range
at the victim, who collapsed.  YANNI then fired two rounds that
hit a second victim.  YANNI and his associates fled the scene

with responding officers recovering five fired cartridge cases (FCCs) from the parking lot where the shooting occurred.  The FCCs were ejected from the pistol used to shoot the victims.

9.   As discussed below, YANNI was arrested two days later after Colton Police Department ("CPD") officers found a loaded unserialized pistol inside of a vehicle linked to YANNI.  During a Mirandized interview, YANNI stated he kept the gun for protection and that he had left the gun inside the vehicle.  A test fire of the firearm seized by CPD showed that the firearm was ballistically linked to the FCCs recovered at the shooting scene outside Celebrities.  An ATF nexus expert determined that at least some of the FCCs recovered from the shooting and the ammunition loaded into YANNI's pistol were manufactured outside of the State of California.

10.  YANNI has a substantial and violent criminal history that includes arrests for robbery, evading with a disregard for safety, battery on a peace officer or emergency personnel battery, and parole violations.  YANNI has felony convictions for assault with force causing great bodily injury, burglary, vehicle theft and being a felon in possession.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.   Background**

11.  Based upon my conversations with other law enforcement officers, my review of police reports, surveillance videos, body worn camera ("BWC") footage, and other materials, as well as my own knowledge of the investigation, I am aware of the following:

**B.    YANNI Shoots Two Victims Outside of a Bar on September 17, 2023**

12.    On September 17, 2023, SBPD officers responded to a shooting at the Celebrities Sports Grill ("Celebrities Bar") in San Bernardino, California.  On scene, officers encountered a victim[1] ("Victim #1"), a Black male adult with multiple gunshot wounds, lying on the ground next to the bar.  Patrons in the bar said that Victim #1 had been shot by a heavily tattooed Hispanic male adult who was in the bar before the shooting.  Victim #1 was transported to an area trauma center.  Officers later learned a second Black male adult victim ("Victim #2") was also being treated for multiple gunshot wounds inflicted at the same shooting.

13.    A SBPD officer traveled to Loma Linda University Medical Center ("LLUMC") to conduct an interview with Victim #1. Victim #1 stated that they arrived at the bar approximately 40 minutes before the shooting and met Victim #2 to celebrate the birthday of a female associate.  Victim #1 indicated there were no issues inside the bar.  He stated that, as he exited the front door of Celebrities Bar, the shooter (later identified by law enforcement as YANNI but not identified by Victim #1) swung a closed fist at him.  Victim #1 said he swung back at the shooter and then the shooter produced a pistol from his waistband and shot Victim #1 multiple times.  Victim #1 said the shooter was a Hispanic male adult, approximately 30 years old,

---

[1] The true identities of the victims referred to in this affidavit are known to law enforcement.  However, to maintain the integrity of the investigation and to prevent witness/victim intimidation, I have not included full legal names in this affidavit.

5'6" in height and 170 pounds, with tattoos on his face, wearing a black baseball cap, a white shirt, and unknown color shorts.

14.   Victim #2 was also interviewed at LLUMC by an SBPD officer.   Victim #2 said he arrived at Celebrities Bar approximately an hour before the shooting, traveling there in a different vehicle from Victim #1.   Victim #2 stated that, when he was exiting the bar to the parking lot, he heard multiple shots fired and then observed Victim #1 on the ground.   Victim #2 said he ran to aid Victim #1 but then ran for cover when more shots were fired.   He said he felt pain but kept moving.   Victim #2 received multiple gunshot wounds.

15.   At Celebrities Bar, SBPD officers conducted an area canvass of the parking lot and, within an approximately 20-foot radius of the front door of Celebrities Bar, located five 9mm fired cartridge cases on the ground.   The officers located what they believed to be two bullet strikes near the front door of the business.

16.   SBPD officers also collected surveillance video from inside Celebrities Bar, which captured the shooting suspect inside the business drinking with associates at a table across from the bar and captured the minutes just before and after the shooting.

17.   A Celebrities Bar employee also provided the officers a cell phone that had been abandoned inside the business after the shooting.   The officers believed the cell phone belonged to a female associate of the shooter because the home screen of the device displayed a photo of the shooter.   Officers noted

similarities in the physical appearance and tattoos of the man in the photo and the shooter in the surveillance video.  YANNI has distinct facial tattoos (as seen in his July 25, 2023 California DMV photo):



18.   Using facial recognition technology, the officers matched the physical likeness of the man in the photo on the phone's home screen to prior booking photos of RAPHAEL YANNI. The officers noted that YANNI's prior booking photos also resembled the shooter in the surveillance video.

**C.   Surveillance Video Confirms YANNI Was the Shooter**

5.   On September 18, 2023, SBPD Officer M. Ghilici was assigned the Celebrities Bar shooting investigation.  Officer Ghilici and I are assigned to the SBPD Special Investigations Unit ("SIU"), whose mission it is to investigate, target, and apprehend violent criminal offenders within the City of San Bernardino, a city recognized as one of the most violent in America.  While criminals often carry firearms for protection

and intimidation on the streets of San Bernardino, only a small percentage of those who carry firearms actually fire their weapons during criminal acts.  Those individuals are the primary focus of SIU's investigative attention.

19.  Officer Ghilici reviewed the surveillance videos, the witness descriptions of the shooter, and YANNI's prior booking photos.  Based upon this review, he positively matched the shooter as YANNI.  I also independently reviewed those materials and believe that YANNI is the shooter depicted in the surveillance videos at Celebrities Bar.[2]

20.  I have reviewed three surveillance videos from Celebrities Bar.  The first video is timestamped at 12:11 a.m. on the morning of September 17 and lasts just shy of two minutes.  In that video, I saw YANNI sitting at a table across from the bar inside Celebrities.  YANNI wore a backwards black snap back style hat, a gold necklace, a black t-shirt, and had numerous tattoos visible on his face, neck, and both his right and left arms.  Sitting to YANNI's right was a tattooed Hispanic female adult who YANNI embraced several times.  Sitting to YANNI's left was a Hispanic male adult in shorts and a black t-shirt, wearing a black Chicago White Sox's hat.  I've included a

---

[2] Officer Ghilici produced a six-pack photo lineup that included a photo of YANNI pulled from a state photographic database and showed the six-pack lineup to Victim #1 at LLUMC.  Victim #1 said he could not remember and did not identify anyone in the line-up photos.

screenshot below for reference (YANNI is circled in yellow):



21.  I then reviewed the second video, which was recorded on the same date, timestamped at 1:08:38 a.m., and lasts 22 seconds.  I saw YANNI wearing the same clothing from the prior video and standing in the hallway that fed the bathroom.  YANNI was with the same Hispanic male adult in the White Sox's hat as well as a younger Hispanic male adult.  All three, led by YANNI, then walked towards the front door of Celebrities Bar.  In the video, YANNI's right hand removed what resembled a black handgun from his waistband.  I noticed the pistol appeared to have a silver or chrome chamber visible in the upper slide assembly of the weapon (top portion of the firearm), just before YANNI tucked it back into his waistband.  As YANNI walked towards the front door, he threw multiple chairs out of his way, appearing to be angry.  This action drew the attention of others inside

8

the bar.  Below is a video screenshot for reference (YANNI with
the pistol in his right hand is circled in yellow):



22.   The third surveillance video I reviewed was recorded
on the same date and timestamped 1:08:57 a.m., lasting only 57
seconds.  The video, which faced the parking lot, showed Victim
#1 walking through the parking lot towards the front door, out
of view, only to come back into view with YANNI a split second
later.  Analysis of the off-camera shadows indicates a physical
altercation had begun between Victim #1 and YANNI.

23.   As both YANNI and Victim #1 came into the frame, I saw
the younger Hispanic male in pants grabbing Victim #1 from
behind.  I also saw YANNI's right arm extended out towards
Victim #1.  Then, I observed a bright flash near YANNI's hand,
which was in a position consistent with a single-handed grip on
a pistol.  The flash was consistent with a gunshot and the

reaction of others in the immediate area was consistent with the reaction to a gunshot based on the near hundreds of shooting surveillance videos I have viewed in my career.  Notably, the location of the muzzle flashes is consistent with where law enforcement found the FCCs.

24.  Near simultaneously, YANNI's younger Hispanic associate dropped his hold on Victim #1, who fell to the ground. As Victim #1 was falling, two more bright flashes were visible from YANNI's hand.  The flashes were again consistent with gunshots.  On the ground, Victim #1 rolled into the fetal position and crawled away.  I've included a screenshot depicting the shooting of Victim #1 for reference below:



25.   As YANNI moved away from the front door towards the
first row of cars in the parking lot, YANNI encountered Victim
#2 moving towards Victim #1.   YANNI turned and fired one round
at close range towards Victim #2, which was represented by a
bright flash just like the prior gunshots.   A second later,
YANNI fired another round at Victim #2, again shown by a bright
flash.   I've included a screenshot depicting the shooting of
Victim #2 for reference below:



26.   YANNI and his Hispanic associate then went towards a
light-colored full-size sedan.   Notably, the vehicle was parked
in a handicap spot.   Once at the sedan, YANNI and his associate
attempted to open the driver's door without success.   YANNI's
associate then sprinted back towards the front door to
Celebrities Bar.

27.   YANNI paced near the sedan for a few moments before sprinting through the parking lot and out of camera view.  Just prior to the video ending, YANNI's associate returned to the sedan and successfully opened the driver's door.  A Hispanic female adult, who appeared to be the female associated with YANNI's group in earlier videos, then opened the rear driver's side door and entered the sedan, which fled the scene.

**D.    Cell Phone Data Also Links YANNI to the Shooting**

28.   On September 19, 2023, after confirming YANNI was on parole with the California Department of Corrections and Rehabilitation ("CDCR"), Officer Ghilici contacted YANNI's parole agent and obtained a phone number for YANNI, namely cell phone number 909-905-4311.  A query of databases revealed the number was registered as "Wireless Caller" to T-Mobile Communications ("T-Mobile").  Officer Ghilici authored a state search warrant for call detail records, subscriber information, and advanced timing reports for the number.  The search warrant was signed by the Honorable Judge Wm. Jefferson Powell of the Superior Court of California, County of San Bernardino.

29.   The warrant was submitted to T-Mobile who returned data associated with the warrant the same day.  While reviewing the return from T-Mobile, Officer Ghilici learned the phone number was associated with subscriber Rapheal YANNI.  Based on locational data associated with YANNI's phone, Officer Ghilici learned that YANNI's phone accessed one or more cell towers in the area of Celebrities Bar between midnight and 3:00 a.m. on September 17.  The 911 call regarding the shooting was received

by SBPD at approximately 1:12 a.m. on September 17.  Officer
Ghilici thus concluded that YANNI's cell phone was within the
relative area of the crime scene at the time of the shooting.

**E.  Colton Police Department Arrested YANNI Two Days Later**

30.  Later in the afternoon of September 19, less than 72
hours after the Celebrities Bar shooting, YANNI was arrested by
the Colton Police Department ("CPD") after being found in
possession of a loaded Glock-type privately manufactured
firearm.

31.  I reviewed CPD reports documenting the encounter and
watched body worn camera footage of the officers' interaction
with YANNI.  The following summarizes the arrest:

a.  On September 19, 2023, CPD Sergeant R. Wilson was
patrolling in a marked CPD unit when he noticed a heavily tinted
Chevrolet Malibu parked in a handicap stall in front of a
Citibank branch office in Colton, California.  The car did not
have a handicapped designation on the rear plate.  A heavily
tattooed Hispanic male adult, later identified as YANNI, was
leaning against the vehicle.  YANNI appeared to be watching
customers using the outside ATMs, which were located just feet
away from the vehicle.  From training and experience, Sgt.
Wilson was aware that criminals often employed skimmers on ATMs
to defraud customers, retrieving the skimmers prior to the
notification of the victims or bank staff.

b.  Sgt. Wilson circled around the bank to contact
YANNI but when he regained sight of the Malibu, YANNI was gone.
Sgt. Wilson established surveillance on the car and saw a female

approach the driver's side of the vehicle.  After seeing the
marked CPD unit, the female quickly walked away.  Sgt. Wilson
and another CPD officer approached the vehicle to check if it
was stolen, occupied, or abandoned.  Sgt. Wilson noted that the
vehicle was still running and appeared to be unoccupied.  He saw
a handicap placard inside the vehicle and a database search
returned that it was not registered to the vehicle.  Bank staff
advised that the vehicle did not belong to anyone inside the
bank.  When no one returned to claim the vehicle with its still
running engine, the officers opened the door to the vehicle to
determine whether the vehicle was stolen or abandoned.  On the
passenger seat of the vehicle, the officers located a California
Driver's License with a photo matching the appearance of the
female that the officers had observed approach and walk away
from the vehicle.  The officers also located pieces of mail
addressed to "Rafael Yanni."  Like the handicap placard, neither
Rafael Yanni nor the name on the driver's license returned as
the registered owner of the vehicle.  Because the address on the
driver's license was only a few blocks away, Sgt. Wilson
traveled to that address while a second CPD officer remained
with the unoccupied vehicle.

        c.    On arrival at the address, Sgt. Wilson saw YANNI
standing in front of the residence.  YANNI no longer had a shirt
on and was extremely sweaty.  YANNI was trying to get into the
front door of the residence as Sgt. Wilson approached in his
unit.  Sgt. Wilson asked YANNI what was going on and told YANNI
that he had seen him at the bank.  Sgt. Wilson asked YANNI if he

was on parole or probation and YANNI said he was on parole.
Sgt. Wilson asked why YANNI fled from the vehicle and YANNI said
he did not want his parole violated.  When asked who the Malibu
belonged to, YANNI said that it belonged to his sister.  He told
Sgt. Wilson that he left his female associate at the bank
because he did not want to get her into trouble.

      d.    Sgt. Wilson asked YANNI if he had any weapons on
him and YANNI said he had dope for personal use.  Sgt. Wilson
retrieved YANNI's California identification card and gave CPD
dispatch YANNI's name.  YANNI told Sgt. Wilson he was a member
of the West Side Verdugo street gang and had caught additional
charges for a stabbing while in custody.  CPD dispatch confirmed
YANNI was on parole for violations of California Penal Code
Section 245, assault with force to produce great bodily injury.

      e.    Sgt. Wilson was aware that subjects on parole for
violent felonies had search terms associated with their parole
status.  YANNI told Sgt. Wilson he was a passenger in the Malibu
and his girlfriend drove him to the bank.  On his abdomen, YANNI
had a distinct firearm-related tattoo of the grim reaper holding
a long gun resembling a Barrett model M82 50 caliber sniper
rifle.

    32.    A search of YANNI's person revealed a small
amount of suspected methamphetamine, retrieved from YANNI's
front pant pocket.  YANNI was then handcuffed and placed in the
back of the CPD unit.  Sgt. Wilson told YANNI a parole search
was going to be conducted on the Malibu and asked if there was
anything illegal in the vehicle.  YANNI said a handgun was in

the car.

        a.    Sgt. Wilson relayed the information to a CPD officer who began a parole search of the Malibu still parked at the bank.  A search under the front passenger seat revealed a concealed black Glock-type privately manufactured firearm ("PMF").  The pistol displayed no serial number.  The weapon was loaded with ten rounds of 9mm ammunition, including one in the chamber.  The CPD officer took the weapon into custody at the CPD station.  I've included a screenshot showing the pistol as recovered for reference below:



**F.    YANNI Admits He Possessed the Gun**

33.  Following the recovery of the weapon, YANNI was transported to the CPD station where Sgt. Wilson conducted a custodial interview.  Sgt. Wilson provided YANNI a <u>Miranda</u> warning and YANNI stated he understood his rights and was willing to speak with the Sergeant.

16

34.   YANNI said "the gun is just protection" and then
stated, "You can't fight nobody anymore without them pulling a
gun on you."  Sgt. Wilson asked YANNI if he walked away from the
car because he knew he had a firearm in the vehicle.  YANNI
replied, "Yeah."  YANNI admitted that he was trying to distance
himself from the vehicle after seeing Sgt. Wilson's unit arrive.
YANNI admitted that the gun was his.  Near the end of the
interview, YANNI said, "I'm done with this shit."  Sgt. Wilson
said that if YANNI was truly done, he wouldn't have had the gun
on him that day.  Without further context, YANNI responded, "I
have to, because the shit they got me out here doing."

35.   YANNI was then transported to the San Bernardino
County Sheriff's Department ("SBSD") West Valley Detention
Center ("WVDC").  Officer Ghilici and fellow SIU Officer B. Keil
met with YANNI who was seated in the WVDC searching cell.
Officer Ghilici provided YANNI a Miranda warning.  YANNI stated
that he understood his rights and was willing to speak.

36.   Officer Ghilici asked if YANNI was at Celebrities on
September 17.  YANNI stated that he was.  Officer Ghilici asked
if YANNI remembered what he was wearing that night and YANNI
replied "nope."  Officer Ghilici asked if YANNI was arrested
with a gun and he replied, "That's what they're saying."

37.  Officer Ghilici stated there was video surveillance of
the restaurant and asked who the female and male associates with
YANNI that night were.  YANNI replied he would only talk about
himself but he admitted that he was at Celebrities Bar that
night.  Officer Ghilici asked if YANNI had a confrontation with

17

anyone inside of the bar.  YANNI did not respond.  Officer
Ghilici asked if YANNI saw a Black male adult in the parking lot
walking back inside the bar.  YANNI replied, "I don't remember
seeing him outside, but I remember that there were some blacks
there and there was a little bit of tension between us and them.
But I was trying to avoid it."  Officer Ghilici asked what YANNI
meant by tension.  He replied, "Yeah we said stuff to each other
and they asked us where we are from."  YANNI explained they were
asking what gang he was from.

38.  YANNI also claimed he did not recall what occurred
outside and at first denied any memory of the shooting. Officer
Ghilici asked YANNI if he remembered having a gun.  YANNI stated
he didn't remember having a gun and asked if the victims lived.
Yanni later admitted he remembered fighting someone but claimed
he did not remember shooting anyone.

39.  After asking about his charges and being told that he
was likely going to be charged with attempted murder, YANNI said
that the Black male with the Pendleton jacket outside
Celebrities Bar appeared to have a heavy object inside the
pocket of the jacket.  YANNI said he grabbed the gun inside the
jacket pocket.  Officer Ghilici asked what YANNI did with the
gun once he grabbed it and if he remembered firing the gun.
YANNI said, "I do not remember firing the gun, but I remember I
woke up and I had that shit I was like nah this isn't even mine
I got to get rid of this shit and I did."

40.  Officer Ghilici asked if the firearm YANNI was just
arrested by CPD with would turn out to be the same firearm from

18

the shooting at Celebrities.  YANNI said, "It's not going to be the same firearm."

**G.   NIBIN Linking the Firearm to the Shooting FCCs**

41.  On September 19, 2023, Officer Ghilici conducted a test fire of the firearm taken into evidence during Yanni's arrest by the CPD.  Two cartridges from the test fire were checked into evidence for a priority entry into the National Integrated Ballistics Information Network ("NIBIN").

42.  NIBIN is a nationally networked system that allows for the capture and comparison of ballistic evidence, mainly in the form of fired cartridge cases,[3] which aids in solving and preventing violent crimes utilizing firearms.  NIBIN leads are intended for investigative purposes only; they posit the potential association between two or more pieces of firearms ballistic evidence based on a correlation review of the digital images in the NIBIN database by a firearms examiner or a trained NIBIN technician.  From experience, I know leads often turn into NIBIN hits where the two pieces of ballistic evidence are

---

[3] The basic components of a single round of ammunition include the case (aka the brass), the primer, the powder, and the projectile (aka the bullet).  When the firing sequence is initiated inside the firearm, the primer is struck igniting the propellant powder, which results in the buildup of immense pressure inside the case.  The pressure subsequently forces the projectile away from the case and down the firearm's barrel in rapid succession.  The completion of the firing sequence leaves the case intact with an embedded spent primer, identified in the law enforcement community as a fired cartridge case.  Although fired cartridge cases are associated with a variety of firearms, in the context of NIBIN, fired cartridge cases typically refer to those pieces of ballistic evidence that have been ejected from semi-automatic or automatic firearms.

confirmed as a match by a firearms examiner via the use of microscopic examination in a laboratory setting.  I know from training and experience that fired cartridge cases are the most common piece of ballistic evidence associated with the NIBIN database.  I have learned fired cartridge cases are entered into the NIBIN database two different ways: fired cartridge cases recovered at crime scenes are entered into the NIBIN database, and test fire fired cartridge cases expended from a known firearm taken into law enforcement custody.

43.  On September 21, 2023, I reviewed the high priority lead results generated via NIBIN.  The lead indicated the test fire of two 9mm fired cartridge cases from YANNI's pistol recovered on September 19, 2023, ballistically matched via NIBIN to the 9mm fired cartridge cases retrieved from the Celebrities Bar shooting scene on September 17, 2023.

## H.   YANNI Has a Significant Criminal History That Includes Violence

44.  I have reviewed YANNI's criminal history listing in National Crime Information Center ("NCIC") database.  I also reviewed online court records from the Superior Court of California, County of San Bernardino, and County of Sacramento. These records reflect a nearly 15-year criminal history of felonies that prohibit YANNI from possessing firearms and ammunition under federal law.  YANNI's prior felony convictions include:

a.   On or about June 29, 2012, case no. FSB1202685, in the Superior Court of California, County of San Bernardino,

for a violation of California Penal Code Section 459, burglary;

b. On or about January 28, 2013, case no. FSB1300186, in the Superior Court of California, County of San Bernardino, for a violation of California Vehicle Code Section 10851(A), vehicle theft;

c. On or about June 9, 2014, Vehicle Theft, case number FSB1300983, in the Superior Court of California, County of San Bernardino, for a violation of California Vehicle Code Section 10851(A), vehicle theft;

d. On or about July 3, 2019, case no. FSB19000167, in the Superior Court of California, County of San Bernardino, for a violation of California Penal Code Section 29800(A)(1), felon in possession of a firearm;

e. On or about September 9, 2021, case no. 20FE009170, in the Superior Court of California, County of Sacramento, for a violation of California Penal Code Section 4501(B), assault with force to cause great bodily injury by a prisoner;

f. On or about September 9, 2021, case no. 21FE008862, in the Superior Court of California, County of Sacramento, for a violation of California Penal Code Section 245(A)(4), assault with force with possible great bodily injury.

**I.    Interstate Nexus**

45. On September 21, 2023, ATF SA Paul Kirwan, an agent with special training in determining the manufacturing origins of firearms and ammunition, examined photos of the fired cartridge cases recovered by SBPD from the Celebrities Bar

shooting on September 17, 2023, as well as the ammunition that was recovered from inside the firearm seized by CPD on September 19, 2023.  SA Kirwan informed me that based on his examination of the photos, it appeared some of the ammunition and fired cartridge cases appeared to be manufactured outside the state of California.

<strong>V.  <u>CONCLUSION</u></strong>

46.  For all the reasons described above, there is probable cause to believe that on September 17, 2023, RAFEAL YANNI committed a violation of 18 U.S.C. § 922(g)(1) (Felon in Possession of Ammunition).


Attested to by the applicant,
Special Agent Jarrett Keegan, in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 25th day of
September 2023.


_____
HONORABLE STEPHANIE S. CHRISTENSEN
UNITED STATES MAGISTRATE JUDGE

22